No. 2743.

SAM GENTRY *v.* THE STATE.

1. THEFT—EVIDENCE.—See the statement of the case for evidence upon a trial for theft *held* to be inadmissible, because hearsay.
2. SAME—PRINCIPAL OFFENDERS.—CHARGE OF THE COURT instructed the jury to "find the defendant guilty if he and Homer Smith were acting together fraudulently, and the horses were taken by either of them." *Held,* erroneous. The charge should have been to the effect that, to constitute the defendant a principal in the theft, he must have taken the horses himself, or must have acted together with Homer Smith in committing the theft, knowing at the time the fraudulent intent of said Smith, and, if not present with Smith at the time of the commission of the theft by said Smith, must have been acting with him at the very time of the commission of said theft in pursuance of a common design existing between them to commit the theft.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction was for horse theft, and the penalty assessed was a term of five years in the penitentiary.

Bob Hineman, the first witness sworn for the State, testified that he was the son of S. Hineman, and lived at Blue Ridge, in Falls county, Texas, about four miles distant from the house of the defendant. Mr. William Nance, the owner of the alleged stolen animal, lived with the witness. S. Hineman, the witness's father, owned a gray mare and a gray gelding, whose range, when at large, was on and across the little Brazos, in Falls county, Texas, covering a distance of three or four miles from the residence of the witness. William Nance had a sorrel horse which ran with S. Hineman's two horses. The horses thus described were taken from their said accustomed range on or about June 19, 1886. The Hineman mare had a bell on when she disappeared. On the twenty-second day of June a man named Popenjoy found the bell and brought it home. The gray mare was a very large animal, fully sixteen and a half hands high. Witness and John Walker commenced the search for the said animals on the twenty-third day of June. They went first to Marlin, in Falls county, and thence to the Brazos, and thence, upon information there obtained, they went to Gatesville, in

Coryell county, and thence through Hamilton county to Brady City, in McCulloch county, at which latter place they found the defendant and one Homer Smith in jail.

Witness found the gray mare in Brady City, at which place he also found the dead body of the sorrel horse mentioned in this indictment. He got the gray horse in Hamilton county. Witness and Walker, having a warrant for the defendant, received him and the gray mare from the sheriff of McCulloch county. They returned at once to Falls county, where they placed the defendant in jail. At the same time, witness and Walker brought back with them a small gray filly, branded TG, which they turned over to the defendant's father. Witness and Walker followed the defendant upon information received at Marlin, and at the various points through which they passed. The animals described by witness, and which were recovered in Hamilton and McCulloch counties, belonged to witness's father, and the sorrel horse which they found dead in McCulloch county belonged to William Nance. They were gentle work stock, and had been turned on the range after the harvest of the crop. It was about seventy-five miles from the witness's father's in Falls county to Gatesville, in Coryell county.

Before starting to Gatesville witness got process for the arrest of defendant and Homer Smith, from Justice Boyles, of the Reagan precinct, the same being issued upon affidavits filed by the owners of the stolen stock, and witness was specially deputized to arrest the defendant and Smith. When recovered, the gray animals were very much jaded from hard riding. The Nance horse lost his hoofs, and at last his life, from the hard riding.

. James Lanham testified, for the State, that he was the sheriff of Coryell county. On the twentieth or twenty-first day of June, 1886, witness was in the town of Gatesville, when he was called upon by a banker to examine some horses which were being offered for sale. Witness and constable Hammack went to a point near a livery stable where the defendant had his horses. He then for the first time saw the defendant to know him. Defendant then had in his possession a gray gelding worth about seventy-five dollars, which he was offering to sell for sixty dollars, and a small gray or roan filly, worth about twenty-five, which he was offering to sell for sixteen dollars. Witness's purpose in going to the livery stable was to question the defendant, examine the horses, and ascertain if he could, whether or not the de-

fendant was a horse thief, and whether or not the horses were stolen animals. No person was with the defendant when witness saw him in possession of the horses in Gatesville. Accordingly he questioned defendant closely. Defendant said that he came from some one of the lower counties, other than Falls, and that he was going to his uncle's in Hamilton county, and was taking the horses with him. He was riding the gray gelding, and was leading the little filly which was branded TG. The witness reached the conclusion that there was nothing crooked about defendant, and did not molest him. The horses had the appearance of having been ridden hard. Defendant was "sharp" enough to deceive the witness; he talked well, and did not impress the witness as a dull boy. Witness saw no indications of a disordered mind in his interview with the defendant. Defendant appeared to be about seventeen years old. A few days after the interview with defendant, Bob Hineman and John Walker passed through Gatesville in pursuit of defendant and the horses, and witness gave them such information as he could. During the interview with witness, defendant said that he got the gray gelding at Coryell City. That animal was branded 9S.

Constable Hammack testified, for the State, substantially as did Sheriff Lanham, and in addition that the defendant gave the name of his alleged uncle who, he said, lived in Hamilton county, and to whose house he was then going. Witness could not remember the name, but had lived in Hamilton county himself for a long time prior to to his interview with the defendant, and had never known a man of the name given by defendant. A few days after defendant left, Bob Hineman and John Walker passed through Gatesville in pursuit of defendant and the horses. A few days later they passed through Gatesville on their return to Falls county, having in custody the defendant and one Homer Smith, whom witness had never seen before, and the horses which defendant had in his possession in Gatesville. The witness discovered nothing in the conduct, talk or deportment of the defendant, while talking to Sheriff Lanham, indicating that his mind was in the least disordered. He impressed the witness as being the reverse of a dull boy.

S. Hineman testified, for the State, that his gray mare and gray gelding, and Nance's sorrel horse, ranged together on Willow creek, near the Little Brazos river, in Falls county, for some time, and until about June 19, 1886, when they disappeared together. The witness's gray mare was branded CT, and his gray

gelding 98. All of the animals were farm work stock, and when taken had but recently been turned on the range. Those horses had often been turned on that range, but always came up until that time. Bob Hineman and John Walker went in pursuit of the horses soon after they disappeared, and got back with the witness's gelding and mare about July 1, 1886. They also brought back with them the defendant and one Homer Smith, who was a stranger to the witness. Witness had never consented to the taking or using of his said stock by the defendant, Homer Smith, or any other person.

William Nance was the next witness for the State. He testified that he was the owner of the sorrel gelding mentioned in the indictment, and described by the previous witnesses. Witness's said animal was on his accustomed range, running with old man Hineman's work horses, on June 19, 1886, on which said day he disappeared. The said horse was branded NEP on the left hip and AT on the shoulder. Old man Hineman's gray mare and gray gelding disappeared from the range at the same time. Witness never recovered his said animal, which was taken by some person without the knowledge or consent of the witness.

John Walker was the next witness for the State. He testified that, a little after dusk on the evening of June 19, 1886, at a point on the read near Reagan, and between four and five miles from Mr. Hineman's house, he met the defendant and another man. They had several horses with them, and among them he thought he recognized old man Hineman's gray mare. The thought struck him that the animals were all mares being taken to Webb's jack. He thought no more of the matter until he was told that horses had been missed from the neighborhood. Witness went with Bob Hineman in pursuit of defendant and the horses, and in his testimony he corroborated in detail the narrative of the said Hineman.

On his cross examination, this witness was asked by the defendant's counsel if Homer Smith had been tried for complicity in this offense. He answered that Homer Smith had been arraigned, and had pleaded guilty to the indictment charging him with this same theft. On re-examination, the prosecuting counsel directed the witness to repeat what was said by Smith when he pleaded guilty. Over the defendant's objection, and by direction of the court, the witness did as directed, and said that Homer Smith, when he entered his plea of guilty, said that he and the defendant took the horses, but that he (Smith) was hired by

Tom Gentry, the defendant's father, to take them, and that at the time of the taking it was understood that the said Tom Gentry and one Bohannon were to follow with another bunch of horses. This is the evidence which constitutes the subject matter of the ruling of this court on this appeal.

Frank Myers testified, for the State, that he lived near the town of Reagan, in Falls county, Texas. On the nineteenth day of June, 1886, he had occasion to pass the old Currie horse pen, and observed, among a number of horses penned therein, the gray mare and gray gelding of Mr. S. Hineman. He saw no parties at the pen; but near a water hole, a mile and a half beyond the pen, he saw two men, whom, because of their distance from him, he did not recognize. He saw and recognized at the water hole a certain little gray filly that belonged to the defendant. She was saddled. The water hole and the place where the men were, were not in sight of the horse pen. No one lived at the pen, nor nearer the pen than a half a mile. Defendant's father lived about a mile from the pen. The said pen was about three miles distant from S. Hineman's house.

H. C. Bohannon testified, for the State, that Homer Smith lived at his house for a month prior to the nineteenth day of June, 1886. Witness left home on the morning of the said June 19, and returned on the evening of the twentieth. Smith was then gone, and witness discovered that several small articles of personal property belonging to him, witness, had disappeared from the house. Smith was the only person the witness left at his house on the morning of the said June 19. Just before the witness left, the defendant came by the house and said that he was going to Bremond. He came to the house alone and left the house alone, going towards Bremond. Defendant and Homer Smith were then intimate associates. The house occupied by witness, and in which Smith lived with him, was on the place of Tom Gentry, the father of the defendant, and was situated a few hundred yards distant from the house occupied by the said Tom Gentry. Smith was a stranger to the neighborhood, was a hired hand of the witness, and until hired by witness, about a month before the alleged theft, had been at work on the railroad. He was about twenty-eight years old. Defendant disappeared, about the same time that Smith disappeared, and witness did not see him again until after he was arrested and brought back to Falls county and placed in jail.

The State rested.

By agreement, the defense read in evidence the written statement of F. M. Miller, sheriff of McCulloch county, as follows: "I am now, and have been for six years next before this date, sheriff of McCulloch county. About July 1, 1886, in the town of Brady, in said county, I, as such sheriff, took into my custody a boy who gave his name as Sam Gentry. He was riding a gray or white mare, about sixteen hands high, which mare was afterwards claimed by one Hineman, a stranger to me, and delivered to him. Sam Gentry had also in his possession at the time I arrested him a dark brown or black pony. I arrested Sam Gentry on suspicion, without any warrant or writ. After I arrested him, he stated that he came from Falls county in company with a man whom he called Smith, or Homer Smith, and that he, Gentry, was going to his uncle's, I think, in Reeves county. He said that Smith was going to Mexico. He said that he left his father's place in company with Smith, who said he would take him to his uncle's. Sam said he rode his own pony until it gave out, when Smith loaned him the gray mare he was riding. He said that Smith had gone on, leaving him to complete an exchange of horses which had been agreed upon with some one in Brady. Upon this information communicated by Sam, I sent two deputies in pursuit of Smith, whom they captured next morning and brought back to Brady. I delivered Smith, Gentry and the horses to Hineman and the man who was with him, they promising to take him to Marlin. Before and after Smith was brought back to Brady, Gentry asked me not to put him and Smith together; that he was afraid of Smith, and feared Smith would hurt him. Sam Gentry told me where his father lived, and I wrote to him. He also told me that Hineman was the owner of the gray mare, and that Smith loaned her to him to ride after his pony gave out. The above conversations with Sam Gentry, in which he explained his possession of the animals, were had while Gentry was in jail and about three or four hours after he was arrested. He sent for witness to come to the jail, and made the above statements. He made no statement when first arrested."

H. W. Black, the next witness for the defense, testified, in substance, that he had known the defendant for many years. Witness was a school teacher. Defendant went to school to him about two months in 1885. Witness boarded about a year in the family of the defendant's father, and saw the defendant daily during that time. He learned, by observation, some of the

peculiarities of the defendant's mind. Witness would compare
the defendant's mind to a stationary vessel of water that would
move on when moved and then only as moved. Defendant
appeared to have no independent mind or thought of his own,
but moved and acted as influenced by others. His prevailing
habit in school was to sit for hours with his head bowed down to
his knees. When admonished by witness, he would straighten
up and gaze at his book, but would soon lapse into his previous
state of absent mindedness. Witness labored diligently to teach
defendant, but could teach him little or nothing. He could spell,
and read a little when he first came to school, and witness put
him in arithmetic, but could never get him through the multipli-
cation table. He rarely, either at home or on the play ground,
spoke unless he was spoken to, and would do nothing at all until
directed by some one. He was an obedient and good boy, con-
fiding and trusting implicitly in those to whom he was attached,
and would believe any miraculous story that was told him. The
witness, judging the defendant's mental calibre from personal
knowledge of him, was of opinion that, when acting under the
influence of those in whom he had confidence, the defendant
was mentally incapable of knowing right from wrong. The
meaning of the witness was that, if a person in whom the de-
fendant had confidence should direct him to commit a particular
crime, the defendant, in committing it, would be moved solely
by the direction of the person, without knowing or appreciating
the nature of the act. Witness thought that he could direct the
defendant to steal an article, and that he would steal it in the
confidence that he was doing an innocent act, and that it would
never enter his mind that the theft was morally or legally
wrong. The witness did not believe that defendant, if let alone,
and not influenced by another person, would steal or do any
other wrong. Free from the influence of others, the defendant
doubtless knew right from wrong. He would feed stock, do
chores and work when directed, and would do his work slowly
but well. He was about seventeen years old, but did not have
the mental capacity of an ordinary boy ten years old.

On his cross examination, this witness said that defendant at-
tended a school in Bremond before he became a pupil of his. He
rode to the school in Bremond, which was several miles from his
home, alone. He used in the witness's school the same books he
used in the Bremond school. A rule the witness always ob-
served as a teacher was never to put a pupil in arithmetic until

such pupil could read and spell well. He put the defendant in arithmetic soon after he entered witness's school, but never succeeded in teaching him the multiplication table. Defendant was a very good farm hand. If he ever chopped up or destroyed the crop in working it, witness did not know it. Witness thought that, uninfluenced, defendant would regard it wrong to steal, but witness thought that, having much influence over defendant, he could get defendant to steal by merely directing him to do it, and that defendant would not regard such theft as either a moral or a legal wrong. This, however, was merely speculation on the part of the witness, who had never attempted to get him to steal. Witness had a high, friendly esteem for the defendant and his father.

William Wyatt testified, for the defense, that he had known the defendant intimately for several years. About seven years before this trial, the witness drove his stock from Falls county to western Texas. Defendant and his father went with witness, and remained with witness, working the stock for three or four years, when witness sold out, and returned to Falls county. Defendant had been back to Falls county about two years. Witness described the mental peculiarities of the defendant substantially as they were described by the witness Black. It was the opinion of the witness that, when swayed by the influence of a person in whom he had confidence, the defendant was totally incapable of distinguishing right from wrong with regard to any particular matter. By way of example, the witness would say, presupposing that he had the defendant's confidence, that if he were to tell defendant to steal a particular article, and sell it for his, witness's, benefit, the defendant, without a conscious thought of doing an illegal or immoral act, would do as directed. Such influence, however, was exercised over defendant only by those in whom he had confidence. Independent of the influence of others, the defendant knew that theft was a moral and legal crime. Defendant would work well when told, but would do nothing unless told to do it. On his cross examination the witness said, in answer to a question, that he meant to convey the idea that, in doing wrong under the direction of some other person, the defendant would not expect to be punished. On re-examination he said that he meant that, acting under the influence of another person, the defendant did not know the right from the wrong of a given act. The defense witnesses John Perry, William Alston and Tom Gentry, the father of the defendant, testified sub-

stantially as did the witnesses Black and Wyatt as to the defendant's mental peculiarities. They concurred in the opinion that, acting independent of any other influence, the defendant knew right from wrong, but when acting under the influence of another person he did not know a moral or legal from an immoral or illegal act. Tom Gentry further testified that the defendant was seventeen years old, and that he, defendant, owned the small TG filly brought back by Hineman and Walker from McCulloch county. When witness learned that defendant and Smith, and Hineman's and Nance's horses had disappeared, he started out to hunt defendant and Smith, and the said horses, going first to Navarro county, from which county Smith claimed to have come to Falls county, and to which county he said, shortly before he disappeared, he was going to return.

The defense closed.

John Walker testified, for the State, in rebuttal, that he had known defendant for many years. He knew defendant to be a good field and stock hand, and that he often worked in the field and with stock when there was no other person about to direct him. From what witness knew of defendant, he was satisfied that defendant knew right from wrong, and that he knew it was wrong, morally and legally, to steal.

William Nance, Henry Bohannon and Bob Hineman, testifying for the State, in rebuttal, corroborated the testimony of the witness John Walker, in rebuttal, and expressed the same estimate of the defendant's mental calibre.

The motion for new trial raised the questions discussed in the opinion.

*Goodrich & Clarkson*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

Willson, Judge. It was error to admit in evidence the declarations made by Homer Smith. These declarations were not called for by the defendant in cross examining the witness who testified to them. They were hearsay, and very damaging to the defendant. They were not admissible evidence against the defendant for any purpose.

The court in its charge directed the jury "to find the defendant guilty if he and Homer Smith were acting together fraudulently, and the horses were taken by either of them." This paragraph

of the charge was excepted to, and the exception is, we think, well taken. It should have explained that, to constitute the defendant a principal in the theft, he must have taken the horses himself, or must have acted together with Homer Smith in committing the theft, knowing at the time the fraudulent intent of said Smith, and, if not present with Smith at the time of the commission of the theft by said Smith, must have been acting with him at the very time of the commission of said theft in pursuance of a common design existing between them to commit the theft. (Smith v. The State, 21 Texas Ct. App., 122; Cook v. The State, 14 Texas Ct. App., 96; Bean v. The State, 17 Texas Ct. App., 61.)

The above mentioned are the only material errors disclosed by the record. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 14, 1887.